**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

FILED

Nov 20 2013, 10:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CURTIS E. SHIRLEY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES AND CROSS-APPELLANTS, CHARLES W. MERLAU AND CHARLES W. MERLAU & SONS PARTNERSHIP:

**PHILIP C. THRASHER**
**STEVEN C. EARNHART**
**DENNIS L. VOELKEL**
Indianapolis, Indiana

ATTORNEY FOR APPELLEE ESTATE OF RICHARD G. MERLAU

**JOHN A. CREMER**
Indianapolis, Indiana

ATTORNEY FOR ESTATE OF CHARLES W. MERLAU

**JOHN S. MERLAU**
New Palestine, Indiana

ATTORNEY FOR SUCCESSOR PERSONAL REP. OF ESTATE OF CHARLES W. MERLAU:

**C. THOMAS CONE**
Greenfield, Indiana

ATTORNEY FOR RAYMOND A. MERLAU:

**ROBERT G. BOGIGIAN**
Greenfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE ESTATE )
OF CHARLES W. MERLAU, DECEASED, )
)
PATRICIA TROUT, )
)
 Appellant, )
)
   vs. )  No. 30A01-1304-EU-166
)
C. THOMAS CONE, et al., )
)
 Appellees. )

APPEAL FROM THE HANCOCK CIRCUIT COURT
The Honorable Richard D. Culver, Judge
Cause No. 30C01-0211-EU-73

**November 20, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

This case stresses the importance of having a will. The decedent had four children who were the heirs and initially served as co-representatives of his estate. Following their father's death, the children continued to operate the family's large farming business.

Trouble started to brew among the heirs regarding the amount, value, and distribution of certain Fifth Third Bank stock that their father had owned. The trial court removed the heirs as personal representatives and appointed a successor in an effort to

2

curb the conflict and craft a final accounting, which the trial court eventually approved. However, the appellant-daughter of the decedent and two cross-appellants, which included one of the sons and the family business, appeal the trial court's entry of the final accounting.

Although we agree that the appellant-daughter's arguments constitute improper attempts to reweigh the evidence and affirm the trial court's judgment to that extent, we find that the successor representative improperly valued the stock, in that it should have been valued as of the date of distribution rather than on the date of the decedent's death. Moreover, we agree with the cross-appellants' contention that all of the heirs should share equally in the payment of the taxes and the loss that was incurred on the stock. Finally, we agree that a subsequent hearing needs to be conducted that also addresses the issue of an administrative claim that the business lodged against the estate.

We therefore affirm in part, reverse in part, and remand this case with instructions for the trial court to conduct further proceedings consistent with this opinion.

## FACTS

Charles W. Merlau, Sr. (Merlau), died without a will in August 2002. He was the patriarch of a large family farming operation in Hancock County. Merlau was survived by his four children, who were the heirs to his estate: Charles W. Merlau, Jr., (Charles), Raymond A. Merlau, Richard G. Merlau, and Patricia (Merlau) Trout (collectively referred to as Merlau's children). Charles, Raymond, and Richard, along with David Merlau, are partners in the Charles W. Merlau & Sons Partnership (CWMS).

3

Merlau's estate was opened on November 7, 2002, in accordance with the Indiana Code provisions governing the unsupervised administration of estates. All four heirs were appointed as co-personal representatives of the estate. However, Richard was the primary fiduciary for the co-personal representatives.

Merlau's children administered the estate and, together with David, continued operating the family farming business. The four children eventually divided some of the property among themselves and signed deeds to numerous farms. While the estate was pending, various estate expenses were paid from funds that belonged to Charles, Raymond, and Richard from the partnership checking account. Richard maintained the "books" for the estate and the partnership. Appellant's App. p. 19. A large portion of the funds are owed to them by Patricia. However, Patricia was not able to repay that debt because of her cash flow problems. When the estate had exhausted its liquid funds, CWMS began paying bills on the estate's behalf.

While the estate was open, a dispute regarding the distribution of some Fifth Third Bank stock that Merlau had owned also arose among the heirs and co-representatives. After failed attempts to reach a global family compromise agreement, Charles filed a motion for the trial court to approve a preliminary final accounting that he had proposed on October 5, 2011.

At a hearing that was scheduled on October 13, 2011, the heirs appeared by counsel, expecting the estate to be closed. As of the time of the hearing, it was established that CWMS had paid the estate's bills totaling $410,121.02. The largest

4

outstanding obligation was a debt owed to the federal government that consisted of an estate tax of $500,000. The majority of this debt is secured by a mortgage on land that Patricia owned. Although the trial court did not hear testimony from any witnesses at this hearing, counsel's statements were accepted as evidence.

While the objective was approval of a final accounting to close the estate, the heirs realized that the "numbers could change slightly as additional administrative expenses come in." Tr. p. 6. The heirs' main dispute concerned the Fifth Third stock. When Merlau died in 2002, the stock was valued at $360,608.16. However, when the stock was distributed in 2010, it was valued at $64,063.89. Patricia, Raymond, and Richard stipulated that Charles and Richard received some of the Fifth Third shares shortly after Merlau died as a partial distribution of their inheritances.

As a result, the issue was whether they would be charged with receiving the date of death value of $360,608.16, or whether the final accounting of the estate should show them receiving sales proceeds of the stock in the amount of $64,063.89. It was asserted that "Richard believes . . . he and Charles were the ones who took the Fifth Third stock and he understands that . . . he will be required to stand that loss." Tr. p. 22-23. Charles, through counsel, testified that he did not believe that there was any such agreement. Also, if the trial court was to determine that Patricia should have been charged with a portion of the loss of the Fifth Third stock, the balance due from Patricia to the estate would have been $111,986.53. Patricia commented at the hearing that:

5

> If the court apportions the loss of the Fifth/Third Stock equally amongst all four [siblings], we have no objection to the numbers in this accounting. . . . So the issue is whether she owes this $411,986 or subtract from that . . . which now brings that number down to $37,850.46. So the court has before it a need to rule on whether, at the end of the day does Pat owe the estate $37,850.46 or $411,986.53.

Tr. p. 28.

The trial court declined to approve the equal distribution of the Fifth Third Bank stock. In other words, it determined that "Richard and Charles shall bear the loss and value of that stock," in an order issued on October 21, 2011. Appellant's App. p. 62. However, the trial court did not provide any valuation date or dollar amount as guidance in the order.

The trial court subsequently amended its original order on June 22, 2012, and questioned the "continued wisdom of allowing the siblings to continue in their capacity as personal representatives." Id. at 64. The trial court also reaffirmed the original order that the "real issue unresolved by the Court was the repayment by [Patricia] to her brothers." Id. Patricia suggested that she pay off the amount she owed by paying her brothers' share of the common debt that was owed to the IRS. Thus, Patricia believed that if she paid a total of $37,850.46, the trial court lacked the authority to change the order that was entered on October 21, 2011.

Patricia filed a motion to deposit $33,583.96, in exchange for a release of any further liability to the estate or heirs. The trial court denied that motion on August 21, 2012. The trial court subsequently removed all four siblings as personal representatives

6

of the estate and appointed C. Thomas Cone as successor personal representative on June 29, 2012. Cone prepared and filed a final accounting on February 26, 2013. Among other things, Cone was charged with determining how much Patricia owed her brothers as well as a repayment plan for the amounts that she owed to each brother in accordance with the trial court's case management order. In other words, Cone purported to "adopt the allocation of the Fifth Third stock shares to the above-mentioned beneficiaries, as required by the Court's [prior orders]" in 2011. Tr. p. 74.

As of October 13, 2011, there was no dispute that the "top dollar" allocation to Patricia was $111,986.53. However, Cone used a figure of $170,556.27 as the "starting point" in his final accounting. Tr. p. 77. Patricia maintains that this amount did not take into account the $161,100 that the three brothers owed her through the partnership.

Cone then deducted $16,015.17, which was not the loss in the value of the Fifth Third stock, but represented "25% of actual value of the Fifth Third Stock when sold." Tr. p. 77. In the end, Cone determined in the final accounting that Patricia was liable to the estate in the amount of $154,540.30. More particularly, Cone's final accounting provided that

> 11. Due to the use of Charles W. Merlau and sons income for the expenses, Patricia [Trout] owes the estate a total of . . . $154,540.30. Said sum is allocated among the partners of Charles W. Merlau and sons as follows: $104,440.47 to Raymond A. Merlau, . . . $41,828.92 to Charles W. Merlau, Jr., and . . . $8,271.71 to Richard G. Merlau.

Appellant's App. p. 75.

7

After Cone had prepared the final accounting, the parties were unable to agree on the initial language that the trial court had used, particularly with regard to the stock. As noted above, some believed that Richard and Charles would receive the stock as of the date of distribution, while others believed the date of death value should be used. The trial court sought to clarify this point in its final judgment when it approved Cone's proposed final accounting on March 19, 2013, in which the stock was valued as of the date of distribution to Charles and Richard.

Additional concerns were raised about the allocation of Fifth Third stock dividends that were accumulated post-mortem in an estate brokerage account. For instance, at the October 2011 status conference, Charles learned for the first time about the account that held such accumulated dividends. In the end, Cone distributed all of these proposed accumulated dividends to Richard in the final accounting.

Cone relied on a withdrawal slip that instructed Fifth Third to liquidate $47,166.06 that should be sent to Richard. This slip was signed by the heirs when Richard was acting as the estate's primary fiduciary. Raymond presented the slip to the trial court at the status conference in October 2011. However, no witnesses testified about the validity or circumstances surrounding it. In short, the parties could not agree on what the withdrawal slip actually meant.

In light of these disagreements, Patricia filed several objections to the final accounting on March 7, 2013, maintaining that the order the trial court signed on October 21, 2011, should not have been changed. More particularly, Patricia contended that

8

"what [she] owes was determined on October 21, 2011. She should not have to bear the cost of a special administrator or continue to be embroiled in litigation because her brothers could not resolve who gets what of this amount, or refused to accept the court's prior rulings." Appellant's App. p. 82. Patricia also alleged that she is owed one fourth of the increased value of the stock and that the trial court should have conducted an evidentiary hearing on these disputes.

Charles asserts that the prior order was only interlocutory and not final and appealable. As a result, he points out that several important issues were left unresolved in the order, and were improperly issued without a hearing or testimony. Moreover, on March 8, 2013, Charles, as a partner and on behalf of CWMS, filed an administrative action for a claim in the amount of $410,121.02. Charles alleged that this was the amount that CWMS had advanced the estate from 2002 through 2012.

Notwithstanding Patricia's objections and the administrative action that Charles filed, the trial court did not conduct a hearing on the objections. As a result, on March 19, 2013, the trial court approved Cone's final accounting and rendered judgment against Patricia that required her to pay her brothers a total of $154,540.30.

On April 5, 2013, Charles filed a motion to correct error with regard to the final accounting. Among other things, Charles alleged that the final accounting and closing of the estate did not occur until March 19, 2013. Charles also maintained that Cone's accounting "mingled" the ownership of the CWMS partnership with the indebtedness owed to the estate. Appellant's App. p. 96. In particular, Charles claimed that

9

8. The parties interested in the Estate and CWMS are not the same. Patricia Trout is an heir but not a partner in CWMS; but, David Merlau is a partner in CWMS but not an heir of the Estate. Therefore, if the loans are not repaid by the Estate, using funds to be provided by the heirs, Patricia Trout will enjoy a windfall and David Merlau will incur a substantial loss.

Appellant's App. p. 96.

Charles argued that an evidentiary hearing should have been held on the final accounting that Cone prepared so that he would be afforded an opportunity to litigate the issues that he raised in his objections. CWMS also filed a motion to intervene in the action. The trial court denied the motion to correct error and the motion to intervene without a hearing.

Patricia appeals, claiming that the trial court's order of October 21, 2011, ended her involvement in the case, and that she should have been released from the action in the amount of $33,583.96. Thus, Patricia argues that the trial court erred in rendering judgment against her in the amount of $154,540.30, and asserts that a hearing should be held on that issue.

The cross-appellants Charles and CWMS also claim that the trial court should conduct a hearing on the issues of: (1) the trial court's refusal to hold a hearing and address objections to the final accounting; (2) a purported double deduction from Richard and Charles's inheritance for the value of the Fifth Third stock; (3) the allocation of the dividends of the Fifth Third stock to Richard; and (4) the failure to address CWMS's administrative claim.

10

DISCUSSION AND DECISION

As noted above, Patricia maintains that while the trial court's order of October 21, 2011, should have ended her involvement in the estate, Cone, as the successor personal representative, filed a subsequent final accounting that did not coincide with the trial court's earlier decision that erroneously resulted in a $154,540.30 judgment being entered against her. Thus, Patricia maintains, among other things, that because she was not "released" in the amount of $33,583.96, she was entitled to a hearing on her objections to the final accounting. Appellant's Br. p. 7.

Charles and CWMS argue in their cross-appeal that a hearing on the final accounting should be held regarding the Fifth Third stock because of the alleged ambiguity in the trial court's order regarding the distribution and valuation of the stock, which of the heirs should bear the loss of the stock's value, and who should pay the taxes that are owed. Charles and CWMS further assert that evidence should be heard regarding the administrative claim that CWMS presented.

## I. Standard of Review

We initially observe that issues raised by an administrator's report and objections are "issues of fact to be tried and determined by the same rules as govern in ordinary civil actions arising out of claims filed against estates." Eble v. Miles, 79 Ind.App. 401, 401, 138 N.E. 361, 362 (1923). The personal representative must verify that he or she has "fully administered the estate of the decedent by making payment, settlement, or other disposition of all claims which were presented." I.C. § 29-1-7.5-4. The personal

11

representative bears the burden of proof to establish the correctness of a final accounting. In re Matter of Estate of Saylors, 671 N.E.2d 905, 907 (Ind. Ct. App. 1996). When filing the accounting, the personal representative must also "file receipts for disbursements of assets made during the period covered by the account." Id. And the personal representative must petition for his account to be settled and allowed. I.C. § 29-1-16-5.

We also note that an administrator's final report constitutes a complaint and objections constitute the answer. Pohlmeyer v. Second Nat. Bank of Richmond, 118 Ind.App. 651, 661, 81 N.E.2d 709, 713 (1948). As a result, a hearing is required unless "all persons entitled to share in the final distribution of the estate waive the service of notice by mail and consent to the final account and petition for distribution without a hearing." I.C. § 29-1-16-6(b).

Cone's final accounting did not comply with these requirements, at least with regard to Charles and CWMS's allegations. Indeed, the proposed final accounting cannot be treated as verified and, therefore, cannot be construed as a permissible proposed final accounting. Moreover, as will be discussed below, Cone's purported final accounting did not include receipts for the disbursement of assets and did not adequately address CWMS's administrative claim.

## II. Patricia's Contentions

Patricia argues that the trial court's judgment must be set aside because it erroneously denied her petition to pay $33,583.96 for a release of any further liability to Merlau's estate or to the heirs. More particularly, Patricia argues that Cone should have

followed the accounting that had been originally proposed and should have respected the original decision that had been entered on October 21, 2011.

When a party is appealing a negative judgment, the proper standard of review to reverse the trial court's decision requires evidence that is without conflict and leads to but one conclusion and the finder of fact reached a contrary conclusion. Captain & Co. v. Towne, 404 N.E.2d 1159, 1162 (Ind. Ct. App. 1980). As to the specific denial of Patricia's petition to pay into the Clerk the sum of $33,583.96 in exchange for a full release, the trial court has the inherent power to control proceedings and the trial court's exercise of such power will not be reversed unless an abuse of discretion has been demonstrated. Boyd v State, 396 N.E.2d 920, 926 (Ind. Ct. App. 1979). An abuse of discretion will only be found if the trial court makes an erroneous conclusion that is clearly against the logic and natural inferences to be drawn therefrom. A trial court has the authority to fashion a remedy to cure whatever injustice has occurred and to grant just and equitable relief. Atkins v. Niermeier, 671 N.E.2d 155, 157 (Ind. Ct. App. 1996).

In this case, the trial court had recently removed the four co-personal representatives when it denied Patricia's petition and appointed Cone as the successor administrator. Cone was appointed to close the estate and resolve the outstanding issues that had not been decided in the case management orders that were previously issued. After mediation proved unsuccessful, it was within the trial court's discretion to allow Cone, the successor personal representative, to determine the amount that Patricia owed, how she would pay the amounts, and how much that each heir should be paid.

13

That said, Patricia does not direct us to anything that might support her contention that the trial court had determined the amount she owed was between $37,850.46 and $111,986.53. The trial court specifically approved the proposed accounting as to "form only" in both the original and amended estate management orders. Appellant's App. p. 62, 64. The trial court did not specify an amount or range of amounts that Patricia owed based on her counsel's arguments. Tr. p. 18. Patricia is also unable to identify any evidence of an earlier distribution where the heirs agreed that only Charles and Richard would pay for the heirs' purported bad judgment in retaining the stock for eight years.

Patricia has failed to support her assertion that the decline in value of the Fifth Third stock that the trial court attributed to Charles and Richard rather than to all four heirs equally, somehow reduced the amount that Patricia should pay her brothers. At no time did the trial court make such a determination in either of the case managements. In fact, the trial court's orders did not support Patricia's unsupported implication that the amount she owed was somehow limited to the amounts set forth above. The trial court heard Patricia's counsel summarize her testimony, and those figures were not adopted. Thus, the trial court did not confirm Patricia's unsupported implication that the amount she owed was somehow limited to the particular amounts that she now asserts on appeal.

To the contrary, Cone set forth in his supplemental final accounting that the loss in value of the Fifth Third stock does not impact the amount owed by each heir or their respective tax consequences. The trial court heard the evidence on October 11, 2011, regarding Patricia's obligation and permitted the heirs to prepare a plan to resolve what

14

Patricia owed and the amount that she should repay her brothers. In the end, the trial court confirmed Cone's final accounting with regard to what Patricia owed and the division of that amount among her brothers. Appellant's App. p. 74, 93.

In our view, the trial court was justified in fashioning a remedy to cure whatever injustice has occurred and to grant just and equitable relief. Atkins, 671 N.E.2d at 157. In sum, Patricia is requesting us to reweigh the evidence, which we will not do. Fowler v. Perry, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005). Thus, we decline to disturb the trial court's judgment with regard to Patricia.

### III. Charles and CWMS

When examining the statutory provisions set forth above regarding our standard of review, it is apparent that Cone's proposed accounting did not comply with those requirements with regard to Charles and CWMS's cross-appeal. Indeed, Indiana Code section 29-1-7.5-4 and -5 require a hearing when there is a dispute regarding closing statements, i.e., accountings, in unsupervised estates.

The joint appellees—other than Charles and CWMS, the cross-appellants— suggest that because the estate was unsupervised, no hearing with regard to the issues raised is required under Indiana Code section 29-1-7.5-1, et seq. However, there is no language in the probate code indicating that other sections do not apply to unsupervised estates. To the contrary, the statutory provisions apply to all estates unless they are specifically disqualified. Moreover, although the joint appellees rely on In re Estate of

15

McNabb, 744 N.E.2d 569 (Ind. Ct. App. 2001), in support of their proposition that a hearing is not required, we find that case distinguishable from the circumstances here.

More specifically, the heir in McNabb sought to reopen his father's estate five years after the estate had been closed. Id. at 572-73. The son claimed that he was not provided with notice of the closing statement and did not receive the assets to which he was entitled. Id. at 573. It was determined that because the estate was unsupervised, he was responsible for monitoring the administration but took no action in the statutory time period, and was barred. Id.

The hearing requirements were not addressed in McNabb regarding unsupervised estates. Indeed, it was established that the heir "had the right to challenge the closing within three months of its filing," but was barred only because he failed to do so. Id. at 573. That said, and notwithstanding our disposition of Patricia's claims, the estate management orders left a number of issues unresolved with regard to the claim of the cross-appellants.

We also note that the joint attorney's conference, which forms the only record available, was created by the trial court on October 13, 2011, and concerned only the 2011 Accounting. There is no evidence of any hearing with regard to the 2013 Accounting. Moreover, Charles and Patricia both filed objections to Cone's proposed final accounting and therefore cannot be deemed to have waived notice of a hearing and cannot be deemed to have consented to the 2013 Accounting. In short, the 2011 case management conference cannot be used as a substitute for a hearing on the 2013

16

Accounting. Hence, for this additional reason, the joint appellees' argument fails because the instant appeal involves the errors regarding the 2013 Accounting and the lack of hearing on the 2013 Accounting rather than the 2011 Accounting. Thus, we now proceed to address the cross-appellants' arguments.

## IV. The Fifth Third Stock and CWMS's Administrative Claims

CWMS points out that the final accounting did not resolve the issues that were necessary to the estate's closing, including CWMS's administrative claim that was allegedly owed to it from the estate, as well as the proper valuation and allocation of the stock. Charles and CWMS also point out that there was no indication as to how the stock transfers would affect the heirs' shares in the estate or whether the federal inheritance and estate taxes were paid. Notwithstanding these objections, the trial court did not hear evidence and issue rulings with regard to these issues. Thus, we will address those claims.

## A. Distribution and Valuation of the Stock

We first note that Cone's proposed final accounting presented issues that had not been presented to the trial court and were not part of Charles's proposed final accounting. In essence, Cone rendered an adjudication of issues for the trial court, which stated:

> The Successor Personal Representative has determined that the actual receipt of the stock dividend on Fifth Third Stock to Richard Merlau was made with the knowledge and consent of all heirs as his separate property and any objection of said distribution to Richard solely has been foreclosed as said distribution was not included in the prior approved accounting.

Appellant's App. p. 75.

17

Cone admitted that the stock distribution was not included in the prior approved accounting. This determination alone required a hearing, particularly since Charles denies that he gave his consent as to the distribution and the amount. Also, even though Indiana law requires that the Fifth Third stock and other probate assets should be valued at the date of distribution, Patricia maintains that Richard and Charles should bear that diminished value. See In re Nobbe, 831 N.E.2d 835, 841 (Ind. Ct. App. 2005) (observing that because the decedent's will did not provide otherwise, the appellants were entitled to any accretion in the stock at the point of sale or, if the stock was not sold, at the time of the trust's termination); see also Fall v. Miller, 462 N.E.2d 1059, 1064 (Ind. Ct. App. 1984) (holding that the trial court erred in denying the beneficiary's petition seeking interest for the value of certain stock from one year after the date of decedent's death to the date of distribution).

As noted above, the estate held the stock for over eight years. And the stock should be valued at the date of distribution and not as of the date of Merlau's death. I.C. § 29-1-17-10(a) (providing that "values for the purposes of such distributions in kind shall be determined at a time not more than ten (10) days prior to the filing of the petition for distribution, and if necessary to avoid substantial inequities may be redetermined at any time prior to the order of distribution"); see also I.C. § 29-1-17-11(b) (recognizing that in-kind assets that are distributed to fewer than all of the distributees of an intestate estate should be valued at the date of distribution). Evidence and argument were not presented with regard to this issue.

18

We also note that the trial court's estate case management order of October 21, 2011, which approved, in part, the proposed final accounting that the co-representatives submitted, stated that "Richard and Charles shall bear the loss and value of [the Fifth Third] stock." Appellant's App. p. 62. Thereafter, on February 26, 2013, Cone included this finding in his proposed final accounting and reflected proposed distributions to be based upon the date of distribution value, which is correct. Id. at 77. However, Cone then made two adjustments, transferring one fourth of the stock value each to Patricia and Raymond.

The October 21, 2011, estate case management order failed to follow the Indiana Code or provide direction on valuation. In rejecting the provisions of Charles's proposed final accounting, the trial court did not adjudicate a date or amount upon which to value the stock. In fact, as noted above, if the trial court intended to value the stock at the date of death, such intent was contrary to statutory law. See I.C. § 29-1-17-11(b) (observing that partial distributions are valued at the date of distribution). That said, Indiana law compelled the trial court to determine that the stock should have been valued on the date of distribution in this instance.

We note that Cone's proposed final accounting coincided with Charles' proposed final accounting on this issue, stating "herewith a final accounting showing the allocation of the Fifth Third stock shares to the above-mentioned beneficiaries, as required by the court's order of October 13 [sic] 2011." Appellant's App. p. 74. However, as noted above, the record establishes that Cone made a second adjustment, where he subtracted

19

$16,015.17 from Charles and Richard and added that amount to Patricia and Raymond. Id. at 77. This particular adjustment had already been made on the line that was entitled "Allocation: Charles and Richard Give one-half 5/3 to P & R." Id. at 79. Charles specifically objected, but was not permitted to be heard on this issue. Moreover, there was no evidence to support an agreement as to a partial distribution, and no evidence was heard on this issue.

Indeed, Indiana Code section 29-1-17-1(a) provides that "upon application of the personal representative or any distributee . . . the court may order the personal representative to deliver to any distributee, who consents to it, possession of . . . property to which he is entitled." Here, there is no evidence that a partial distribution was made prior to 2010, when possession was delivered to Charles and Richard. If the actual transfer of the stock to Richard and Charles in 2010 was a partial distribution, the proposed final accounting already adjusted for this. Appellant's App. p. 87. And it was demonstrated that the stock remained in the estate for eight years.

There was also no agreement among the heirs that supported a partial distribution, and evidence was not heard on this issue. In fact, there was only a letter of instruction from Fifth Third that authorized a stock transfer to Richard and Charles that had been received for the first time by the other heirs at the case management conference on October 13, 2011. The letter bears no date and does not indicate an intent to distribute the stock to Richard and Charles at a date of death value. The letter was not discussed at the

20

2011 attorneys' conference; nor was there any mention that it included the Fifth Third stock as well as the accumulated dividends on the stock.

Also, for an agreement of this type to be enforceable, the terms must be set out in writing, signed by all heirs, and submitted to the court for approval. I.C. § 29-1-9-2. The trial court must then provide notice to all interested persons before ordering an approval of the agreement. I.C. § 29-1-9-3; In re Estate of Garwood, 400 N.E.2d 758, 766, 272 Ind. 519, 530 (1980). Additionally, because the stock was in Merlau's name, it is a non-cash probate asset and subject to the Indiana Probate Code. I.C. § 29-1-13-1. Thus, it was taxed at the date of death value and all four heirs should share equally in the payment of the tax.

Here, the heirs could not agree when to sell the stock so, as noted above, it remained in the estate for over eight years until 2010. Thus, the stock should be valued at the date of distribution, which occurred in September 2010, and it is erroneous to value the stock at the date of Merlau's death.

Additionally, we note that a "compromise to any contest or controversy" regarding the rights or interests of an heir in an estate, or the administration of an estate, is enforceable only if certain statutory requirements are met. I.C. § 29-1-9-1. For such an agreement to be enforceable, the terms must be set out in writing, signed by all heirs, and submitted to the court for approval. I.C. § 29-1-9-2(a) and (b). The trial court must then provide notice to all interested persons before ordering the agreement's approval.

21

The above requirements were not satisfied in this instance. Rather, the only evidence with regard to this contention was Fifth Third's letter of direction to transfer stock that bears no date and does not indicate an intent to distribute the stock to Richard and Charles at a date of death value. Again, the letter does not state that the assets in the Fifth Third account, stocks and dividends, were to be given to Richard or anyone else as their individual property. As a result, that evidence is not sufficient to support the claim that an agreement regarding the Fifth Third stock exists.

That said, because the stock was in Merlau's name, it is a non-cash probate asset and subject to Indiana Code section 29-1-13-1. Thus, the stock was taxed at the date of death value and all four heirs share equally in the payment of that tax. And as discussed above, even if it was established that there was some type of family agreement, it is contrary to statutory law to value the stock at the date of death. In short, the stock is a probate asset, and it belonged to the estate until distribution. I.C. § 29-1-13-1.

Because all of the heirs were fiduciaries of the estate, Charles and Richard could not sell or distribute the stock without the consent of all. In other words, burdening Charles and Richard with the loss in value creates a windfall for the other heirs, which is a breach of their fiduciary duty to treat Charles and Richard fairly and equally with Patricia and Raymond. Indeed, personal representatives are "regarded as . . . trustee[s] appointed by law for the benefit of and the protection of creditors and distributees of that estate." In re Supervised Estate of Scholz, 859 N.E.2d 731, 736 (Ind. Ct. App. 2007). And "every personal representative shall be liable for any loss to the estate arising from

22

his neglect or unreasonable delay in . . . selling, mortgaging or leasing the property of the estate . . . [and] for loss to the estate through self-dealing." I.C. § 29-1-16-1(c). As co-personal representatives, each heir had a fiduciary duty to sell or distribute the Fifth Third stock, especially with the knowledge that the value of the stock was plummeting. They cannot breach that duty and avoid the penalty for doing so.

As for the stock dividends from Fifth Third, we note that a personal representative, as a fiduciary, may deposit the funds of the estate as a general deposit in a checking or savings account if it is consistent with proper administration of the estate. I.C. § 39-1-13-15. The record shows that the four co-personal representatives signed a letter of instruction authorizing the liquidation of the Fifth Third stock dividends, and to transfer those dividends to Richard. Appellant's App. p. 52. As the principal fiduciary at the time, it was certainly not unreasonable that the heirs would agree to sending the liquidated stock to Richard, presumably for transfer to an estate banking account. However, it is apparent that Cone incorrectly determined that this act constituted an agreement for Richard to keep the cash for himself without providing a cash credit to the other heirs. Id. at 75.

Contrary to Cone's recommendation in the final accounting, there is no evidence suggesting that the heirs consented to Richard's taking of the $47,166.06 in dividends for himself. As mentioned above, for an agreement such as this to be enforceable, the terms must be set out in writing, signed by the four heirs, and submitted to the court for approval. I.C. § 29-1-9-2(a)-(b). All interested parties must then be presented with

23

notice before the court can order an approval. These requirements were not met here. See Garwood, 272 Ind. at 533, 400 N.E.2d at 766 (observing that there was insufficient evidence to support the existence of a family agreement when the terms were not in writing and not all heirs were present to consent to the agreement). Because the letter of instruction from Fifth Third alone is insufficient to provide evidence of consent to a reduced inheritance, we are compelled to reverse this portion of the judgment and remand this cause to the trial court with instructions that it hear evidence, as necessary, with regard to this issue.

## B. CWMS's Administrative Claim

Cone's proposed final accounting also acknowledges that CWMS paid administration expenses and taxes on behalf of the estate after the liquid assets of the estate had been exhausted. However, the final accounting does not provide for the payment of that debt. Rather, it confuses CWMS with Raymond, Richard, and Charles as individuals, rendering monetary judgments against Patricia in favor of her brothers. Cone does not mention the payment of the debt by the Estate to CWMS. The record shows that the debt owed to CWMS remains unpaid and the estate cannot be lawfully closed. In other words, if the judgment is affirmed, the estate will not have paid CWMS the outstanding balance of $410,121.02, exclusive of interest. The estate must pay CWMS—not the heirs. And the heirs must reimburse the estate for their excess interim distributions. To be fully administered the estate must return its assets and liabilities to zero, which can only be accomplished by paying the CWMS claim. I.C. § 29-1-7.5-4. In

essence, disregarding an administrative claim and passing the estate's obligation on to the heirs is an improper way to administer the estate's assets and liabilities.

Although it is contended that Cone never received a claim from CWMS seeking repayment of the debt, CWMS, in fact, submitted an invoice together with its objections. Appellant's App. p. 91. And claims for administrative expenses "may be allowed at any accounting." I.C. § 29-1-14-10(b). Moreover, administrative expenses are exempt from the statute of limitations for claims. I.C. § 29-1-14-1(a). As a result, it is apparent that this invoice is sufficient as a claim for CWMS's administrative expense, and the trial court should hear evidence with regard to this issue.

## CONCLUSION

In light of the foregoing, we affirm the trial court's judgment with regard to Patricia. However, we reverse the trial court's order that was entered on March 19, 2013, and remand for a hearing on Cone's final accounting regarding the value and distribution of the Fifth Third stock and whether CWMS is entitled to payment of its administrative claim.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

FRIEDLANDER, J., and VAIDIK, J., concur.